## A00A1942. SHASTA BEVERAGES, INC. v. TETLEY USA, INC.
### (546 SE2d 800)

ELLINGTON, Judge.

After its newly developed, ready-to-drink tea product line spoiled on the grocery shelves, Shasta Beverages, Inc. filed a product liability suit against tea supplier Tetley USA, Inc., alleging breach of contract, breach of express and implied warranties, negligence, negligent misrepresentation, and failure to warn. After a three-week trial, the jury found in favor of Shasta on its claims for negligent misrepresentation, negligence, and breach of express warranty, but awarded zero damages. Shasta appeals from the denial of its motion for new trial. Finding no error, we affirm.

The facts of this case, viewed in favor of the jury's verdict,[1] are as follows: In 1994, Shasta decided to develop and market a tea beverage called "SunTea." SunTea was to be produced through a "cold fill" procedure, where preservatives are used instead of hot water to kill microbes. Shasta stated that it chose the "cold fill" procedure because it was significantly cheaper than the "hot fill" process and could be performed in all of their plants, saving shipping charges.

SunTea was made from tea powder, water, sweetener, flavoring, and preservatives. Shasta contacted Tetley about providing tea powder for a cold fill process, and Tetley recommended tea formulation 130 PSI-LD-C ("powder"). Shasta did not give Tetley any microbiological requirements for the powder and did not request information about the powder's microbiological count per gram. Tetley sent a specification sheet for the powder, which stated that the powder was "Pure Instant Tea" and that it "conforms in every respect to the provisions of the Federal Food, Drug and Cosmetic Act. It is clean and palatable, contains no foreign matter, and is manufactured in the USA in accordance with Good Manufacturing Practice." In fact, the tea was grown in Argentina and made into a powder in Chile, then shipped to Tetley's Morris Plains, New Jersey, plant and repackaged without further processing.

---

[1] *Hensley v. Henry*, 246 Ga. App. 417, 419 (1) (541 SE2d 398) (2000).

Shasta purchased the powder and developed a formula for Sun-Tea, which included determining the levels of preservative necessary to prevent spoilage. Shasta determined the preservation level by reviewing textbooks and consulting with other tea suppliers. Shasta made several "test runs" of SunTea to determine microbiological counts, and the product "checked out fine." In March 1995, Shasta began manufacturing SunTea in its Columbus, Ohio, and La Mirada, California, plants.

Shortly after the product was distributed, SunTea began to spoil on the grocery shelves, and Shasta recalled the product. After reformulating SunTea, Shasta still experienced spoilage. Shasta contacted Tetley, which said that the preservative levels were wrong and recommended changes. Tetley also recommended that SunTea have a maximum pH of 2.9 to 3.0, but Shasta was unable to reduce the pH to below 3.7. Shasta eventually stopped using Tetley's powder in Sun-Tea. Shasta tested the powder, however, and discovered that it contained yeast, which could cause spoilage.

After substituting liquid concentrate for the powder and making "radical changes" to the amount and proportions of preservatives and other ingredients, Shasta produced SunTea that did not spoil. Shasta contends, however, that by then SunTea's market reputation was irreparably damaged. Shasta sued Tetley to recover the costs of developing and marketing SunTea, as well as lost profits.

At trial, Tetley defended against the negligence allegations by presenting a memorandum prepared by one of Shasta's field quality administrators regarding his unannounced inspection of Shasta's La Mirada plant in January 1995. According to the memorandum, the inspector found the following: roof leaks throughout the plant, resulting in water puddling; forklift holes in storage boxes and "leaking product"; unprotected bottle caps and crowns; mold and "crud" on equipment; "scummy water" on equipment; ceiling damage over equipment; leaking tanks; and dirty floors. The sanitation audit score was 82.9 percent. The inspector returned to La Mirada in May 1995, after the SunTea spoilage came to Shasta's attention. He found "mold/slime" on the floors and bottling equipment. There was still a hole in the ceiling with dust, dirt, and mold contamination and a fan blowing across the area. His report stated that the floor of the "fill and syrup areas" also had holes "where stagnant water had collected and some of the pools were fermenting. This condition could provide air-borne micro-organisms." Shasta immediately cleaned and sanitized the plant, during which it discovered "specific areas that could contribute to contamination of the finished beverage." Even so, in October 1995, after the sanitation and months after the last SunTea run, the inspector's memorandum stated that plant conditions were worse. In addition to the problems documented in previous inspec-

tions, the October inspection also found evidence of insects in the plant and "spotty" record-keeping. The sanitation score dipped to 80.5 percent.

Notably, SunTea "Product Formula" sheets, listing the ingredients and production instructions for the product, did not mention sanitation requirements until June 13, 1995, when the following statement was added: "Note: This is an extremely sensitive item and requires a full 7-step sanitation the same as a 10% juice prior to running." Although a weekly seven-step sanitation procedure is mandated for all noncarbonated products, the evidence showed that the La Mirada plant conducted the procedure only three times during a 23-week period from February to September 1995. The Columbus plant did not conduct a seven-step sanitation procedure from January through August 1995. Further, Tetley demonstrated that the water supplies for both Shasta facilities had bacterial counts that were considered "too numerous to count" during June 1995.

Finally, Tetley presented evidence to demonstrate that Shasta's alleged lost profits were purely speculative and based upon a questionable premise: that the SunTea product line would, in fact, be successful. For example, Tetley demonstrated that the "dramatic growth" in the beverage market had leveled off by 1995 and that Shasta introduced the product too late in the year to capitalize on the summer market. There was also evidence that Shasta's pricing strategy was not competitive.

1. In its first enumeration of error, Shasta challenges the trial court's decision to exclude as irrelevant the testimony of Harry Chapman, the former manager of the Tetley plant in Morris Plains. Shasta sought to introduce Chapman's deposition at trial in order (a) to demonstrate that Tetley had a duty to warn Shasta about the tea's allegedly high microbiological count; and (b) to rebut Tetley's assertions that spray-drying tea powder with high heat will destroy all microbes.

> Generally speaking, questions of relevance are within the domain of the trial court, and, absent a manifest abuse of discretion, a court's refusal to admit evidence on grounds of lack of relevance will not be disturbed on appeal. The rule is usually stated that the judge may exercise his discretion in excluding relevant evidence if he finds that its probative value is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice or of confusing the issues or of misleading the jury.

(Citation and punctuation omitted.) *Goss v. Total Chipping*, 220 Ga. App. 643, 644 (2) (a) (469 SE2d 855) (1996). See also *Ray v. Ford*

*Motor Co.*, 237 Ga. App. 316, 317 (1) (514 SE2d 227) (1999).

Chapman did not participate in the processing of Shasta's tea powder and did not testify at trial. Shasta proffered Chapman's deposition, which stated that in 1996 or 1997, a batch of carbo instant tea powder[2] spray-dried at the Morris Plains plant showed a microbiological count of 6,000 after processing. Because this count was higher than normal, Tetley started to thoroughly clean the processing equipment on a regular basis, and the count of subsequent powder batches decreased. Chapman deposed that, even though Tetley's standard maximum microbiological count per gram was 10,000, he called the customer who purchased the 6,000 count powder, because the customer previously had specified a 1,000 count maximum for its powder and the 6,000 count might be "unacceptable." By the time Tetley contacted the customer, however, it already had distributed some of the 6,000 count powder. Even with the higher than normal count, products made with the powder did not spoil.

(a) Shasta claims Chapman's deposition testimony was necessary to demonstrate that Tetley had a duty to warn Shasta about the allegedly high microbiological count of its powder. Initially we note that Shasta has not cited to any evidence to establish that the count of the powder it received from Tetley was, in fact, high. Further, unlike the customer Tetley contacted about the 6,000 count, when Shasta ordered the powder from Tetley, Shasta did not specify a maximum acceptable microbiological count. Apparently, Shasta never inquired about the count until after spoilage occurred. As such, the question becomes whether Tetley had a duty to warn a customer of a microbiological count that was lower than Tetley's maximum standard count, in the absence of the customer's specification of a maximum acceptable count. Since Chapman's testimony did not address this issue, we find that the trial court did not abuse its discretion in excluding it as irrelevant.

(b) Shasta also complains that Chapman's deposition testimony should have been admitted to show that contamination can take place within spray-drying equipment, so that Shasta's tea powder *could* have been contaminated[3] by the spray dryer in the Chilean processing plant. Shasta argued that Chapman's deposition rebuts Tetley's alleged assertions that the spray-drying process destroyed all microbes in tea powder.[4]

---

[2] Carbo instant tea powder contains corn syrup and tea.

[3] As noted above, Shasta presented no evidence of the actual microbiological count of the Chilean tea powder. According to Shasta, "without any testing, we don't know the condition of [the Chilean] powder."

[4] These assertions included the testimony of Tetley's chairman, Dr. Robert Carbonell, who holds a doctorate degree in pharmaceutical chemistry. Carbonell testified that, while spray-drying is "not a method that one would use to . . . clean up dirty tea," at the end of the

The proffered testimony, however, concerned an incident that happened one or two years after Shasta received its tea powder from Tetley. Shasta's powder was not spray-dried at the Morris Plains plant, but was processed at a Chilean plant and shipped to Tetley for repackaging only. Since Chapman never testified about the type of equipment used at the Morris Plains Tetley plant, there was no evidence that the spray-drying or other equipment used in that plant was the same or even similar to that used in the Chilean plant. Further, unlike inferences that could be drawn from Chapman's testimony regarding the unsanitary condition of the Morris Plains equipment, no evidence was presented to demonstrate how often the Chilean spray-drying equipment was cleaned or that it was ever unsanitary. Finally, the carbo instant tea powder that was spray-dried by Chapman was not the same product as that sold to Shasta, and Chapman did not know if the powder even included Chilean tea.

Although evidence of other problematic incidents involving a product may be relevant and admissible in product liability actions, "[w]ithout a showing of substantial similarity, the evidence is irrelevant as a matter of law." *Ray v. Ford Motor Co.*, 237 Ga. App. at 317 (1). Given Shasta's failure to demonstrate that the Morris Plains incident was substantially similar to the facts at issue in this case, we find that the trial court did not abuse its discretion in excluding Chapman's deposition testimony as irrelevant. Id.; see also *Goss v. Total Chipping*, 220 Ga. App. at 644 (2) (a).

2. Shasta contends that the trial court erred in denying its motion for new trial because the verdict awarding zero dollars was inadequate, inconsistent with the evidence, and contrary to the law. Shasta argues that a finding in favor of Shasta on negligent misrepresentation requires the award of monetary damages. See *Hardaway Co. v. Parsons, Brinckerhoff &c., Inc.*, 267 Ga. 424, 426 (1) (479 SE2d

---

entire procedure of changing tea leaves to a fine, dry powder, the powder is free of microbes "[t]hat can cause spoilage in its dry stage, as long as it is dry, as long as the water activity is low enough to prevent any microbes from proliferating." He emphasized, however, that it is the extraction process — not the spray-drying — that kills the microbes, saying "the spray dryer does not clean. The spray dryer dries." Carbonell later testified that the high heat used in the spray-drying process would "tend to kill microbes and keep them away," because the processed tea powder has a very low moisture content. He stated that the powder was "microbially stable . . . because it has very low water activity." Tetley's expert in food microbiology agreed that, while the high temperature of the spray-drying will "kill" yeast, exposing the powder to moisture will "reactivate" the yeast.

Notably, this opinion was shared by Shasta's own expert, who stated that spray-drying the tea powder will destroy some yeast while "stress[ing]" the remaining yeast. The remaining yeast may remain inert for a period of time until it is rehydrated and resuscitated. This accounts for the significant delay between bottling the processed tea and its spoilage. Shasta's expert also stated that, because of the spoilage delay, incubating the powder for only three days, as Shasta did, would be an insufficient amount of time to determine if yeast growth and spoilage will occur.

727) (1997) (the elements of negligent misrepresentation include an economic injury that was proximately caused by reliance on the defendant's false information). We disagree, however, because the jury's verdict, while ambiguous, was not per se inconsistent with its finding on negligent misrepresentation and was supported by the evidence. "[I]f possible, even ambiguous verdicts should be upheld." (Citation and emphasis omitted.) *Bunch v. Mathieson Drive Apts.*, 220 Ga. App. 855, 858 (1) (470 SE2d 895) (1996). Further,

> [t]he question of damages is ordinarily one for the jury; and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case.

OCGA § 51-12-12 (a). This Court must affirm a judgment entered on a jury verdict "if there is any evidence to support it because 'the jurors are the sole and exclusive judges of the weight and credit given the evidence.' " *Hensley v. Henry*, 246 Ga. App. 417, 419 (1) (541 SE2d 398) (2000).

In this case, the evidence supported a finding that Tetley made negligent misrepresentations regarding the specifications for the tea powder provided under the contract and that Shasta was damaged when it relied on the misrepresentations. The jury also could have found, however, that Shasta was comparatively negligent in failing to use the necessary level of preservatives or in failing to maintain a clean bottling environment and that such negligence was equally or more responsible for its damages than Tetley's negligent misrepresentation.

> Under the comparative-negligence doctrine of this state, a plaintiff whose negligence is less than that of the defendant is not denied recovery although his damages shall be diminished by the jury in proportion to the degree of fault attributable to him. However, where the negligence of the plaintiff and the defendant are equal, or the negligence of the plaintiff is more than that of the defendant, the plaintiff could not recover.

(Citations and punctuation omitted.) *Bridges Farms v. Blue*, 267 Ga. 505 (480 SE2d 598) (1997). The jury received instructions on the law of comparative negligence. This Court's role in reviewing a verdict that combines a finding of defendant's negligence with zero damages is not to "enter the jury box but to determine whether a trial court's ruling on a motion for new trial . . . was error under OCGA § 51-12-12." (Citation and punctuation omitted.) *Robinson v. Star Gas of*

*Hawkinsville*, 269 Ga. 102, 104 (1) (498 SE2d 524) (1998).

Since the evidence presented in this case supports a finding that Shasta's own negligence was greater than or equal to Tetley's negligence, we cannot say that the damages are so inadequate as to be inconsistent with the preponderance of the evidence. OCGA § 51-12-12 (a). Further, the jury's verdict was not contradictory or irreconcilable. See *Bunch v. Mathieson Drive Apts.*, 220 Ga. App. at 858 (1).[5] The trial court did not err in refusing to grant a new trial.

*Judgment affirmed. Andrews, P. J., and Ruffin, J., concur.*

DECIDED MARCH 2, 2001 — ▮▮▮▮▮▮▮▮

*Hawkins & Parnell, Jack N. Sibley, Cullen C. Wilkerson,* for appellant.

*Swift, Currie, McGhee & Hiers, John Campbell, Stephen L. Cotter,* for appellee.

---

[5] This case is distinguishable from *Bunch*, supra, wherein the jury awarded no damages for the decedent's wrongful death, but awarded full coverage of funeral expenses. Id. at 858 (1). As this Court pointed out, the failure to award wrongful death damages could be explained if the jury found that the decedent's negligence was equal to or greater than the defendant's. Id. This finding, however, would preclude a finding that the same defendant was liable for funeral expenses. Id. Therefore, the jury verdicts were "contradictory and irreconcilable," and this Court reversed the judgment entered thereon. Id.